# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 18, 2021

## STATE OF TENNESSEE v. BRADLEY ROBINSON

**Appeal from the Criminal Court for Knox County**
**No. 108569   G. Scott Green, Judge**

FILED

MAY 1 1 2021

Clerk of the Appellate Courts
Rec'd by

**No. E2020-00555-CCA-R3-CD**

Defendant, Bradley Robinson, appeals his Knox County convictions for facilitation of first degree felony murder and facilitation of especially aggravated robbery, for which he received an effective sentence of thirty-seven years to serve in the Tennessee Department of Correction. On appeal, Defendant contends that the evidence presented at trial was insufficient to establish his guilt beyond a reasonable doubt. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Liddell Kirk (on appeal) and Rhonda F. Lee (at trial), Knoxville, Tennessee, for the appellant, Bradley Robinson.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme P. Allen, District Attorney General; and Philip H. Morton and TaKisha Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.    Factual and Procedural Background

The Knox County Grand Jury indicted Defendant and Co-Defendant, Tyshon Booker, with two alternate counts of first degree felony murder in the death of G'Metrick

Caldwell and two alternate counts of especially aggravated robbery.[1]  At trial, Sergio Rosales testified that, on November 15, 2015, he was at his home on Linden Avenue when he heard gunshots.  He looked outside and saw men running from a red car.  He said that he called 911 to report hearing gunshots and that he provided police with video surveillance footage from the front porch of his home, which showed two men exiting the red car.

Alneshia Allison testified that she also lived on Linden Avenue on November 15, 2015, and heard several gunshots shortly after 5:00 p.m.  Several minutes later, she went outside and saw the victim lying on the ground on his back, right outside of a red car.  She then called 911.

Officer Jimmy Wilson of the Knoxville Police Department (KPD) testified that he was dispatched to Linden Avenue following the reports of the shooting.  Upon arrival, he saw a wrecked car in the road and the victim lying partially on the ground outside of the vehicle with a gunshot wound to the chest.  Officer Wilson explained that the victim's lower body was inside the car and his upper body on the ground.  Officer Wilson called for EMS, the fire department, and for police department investigators to come to the scene.  Officer Wilson stated that, when paramedics arrived, they found that the victim had a pulse and transported him to the hospital.

Sergeant Jeremy Maupin testified that, on November 15, 2015, he worked as an investigator with the KPD Violent Crimes Unit.  Sergeant Maupin stated that he responded to the scene on Linden Avenue and began canvassing the neighborhood for witnesses.  He learned that, following the shooting, the two suspects ran through a yard and into an alley heading west.  He said that he called a K9 officer to the scene and that they conducted a K9 track through a yard and into the alley but that the K9 lost the track.  Sergeant Maupin then went to Thumbs Up Market on East Magnolia and spoke with the manager.  He learned that the market had exterior video surveillance cameras, and he reviewed the video surveillance footage with the manager.  Sergeant Maupin said that the surveillance footage showed two suspects dressed in dark clothing running through a yard and then down the alley, which corroborated witnesses' observations following the shooting.

Tiffany Springer testified that she met Co-Defendant Booker in the summer of 2015 and that he introduced her to Defendant in October of that year.  Ms. Springer said that Defendant and Co-Defendant Booker occasionally came to her aunt's house where Ms. Springer saw them in possession of firearms.  She explained that, at the beginning of November 2015, she saw Co-Defendant Booker with "a black gun" and Defendant with "a little brownish gun."  She identified a video filmed in her aunt's kitchen in November 2015 that showed Defendant with a gun and explained that her aunt, Linda Hatch, had provided

---

[1] Defendant's case was severed from that of Co-Defendant Booker's prior to trial.

the video to police. Ms. Springer identified one of Defendant's friends, "Ears" Tate, on the video and stated that Defendant, Co-Defendant Booker, and "Ears" Tate were part of a group of friends called "The Chain Gang." She explained that they referred to themselves as The Chain Gang because they liked to wear gold chains. Ms. Springer testified that, after Ms. Hatch turned over the video to police, she and Ms. Hatch returned to Ms. Hatch's house to look for shell casings on the back porch because Defendant and his friends had previously fired guns from the back porch. Ms. Springer recalled that they found several shell casings and called the police to collect them.

Stephanie Housewright testified that she worked as a crime scene technician for the KPD. She said that, on November 20, 2015, she went to Ms. Hatch's house and collected two spent 9mm shell casings from the back deck of the house.

Timothy Schade testified that he was previously employed by the KPD as a crime scene investigator and that he was a certified latent print examiner. Mr. Schade explained that he responded to the scene of the shooting on Linden Avenue where he spoke to investigators and then began photographing the scene and collecting items of evidence. Mr. Schade testified that the victim's car was towed to a police garage where he processed it for evidence. He said that he found a loaded SCCY pistol and a spent 9mm shell casing on the driver's side floorboard. He collected a second 9mm shell casing in the door handle of the rear passenger side door. He also collected from inside the car some CDs, a gray t-shirt, a black glove, a baseball cap, a cup top and a straw, a Powerade bottle, a Coke bottle, a third spent 9mm shell casing, and an envelope containing a plastic key. Mr. Schade explained that he had found a fourth spent 9mm shell casing on the ground by the rear passenger side tire before the car had been towed.

Mr. Schade explained that he processed the victim's car for latent prints. He said that he collected multiple latent prints on the outside of the car, on the passenger side between the front and rear windows, and a print on the passenger side rear door. He obtained known fingerprint samples from Defendant and Co-Defendant Booker for comparison. Mr. Schade determined that several latent prints found in the car were from Co-Defendant Booker, including prints from the quarter panel above the wheel well, passenger side rear armrest, and two prints on the passenger side rear door. Additionally, he testified that multiple latent fingerprints matched Defendant's, including prints on the exterior of the passenger side front door and on the interior door handle on the front passenger side. Mr. Schade stated that, following the victim's autopsy, he collected six bullets from the victim's body, the victim's personal effects, and a DNA card for the victim. Mr. Schade testified that, when Defendant was arrested following a traffic stop, officers found a .32 caliber handgun and some handgun ammunition in Defendant's possession.

Special Agent Kim Lowe with the Tennessee Bureau of Investigation (TBI) testified that she was a forensic scientist working in the Forensic Biology Division of the Knoxville Crime Laboratory. Agent Lowe stated that she processed items collected from the victim's car and found that some of the DNA samples obtained from the items matched the known DNA profiles of Co-Defendant Booker and of Defendant. Specifically, she stated that Defendant's DNA was located on the gray t-shirt and black glove found inside the victim's car.

Special Agent Alex Brodhag of the TBI testified that he worked in the Nashville Crime Laboratory as a firearm examiner. Agent Brodhag explained that he examined an orange jacket that had been worn by the victim. He attempted to make a muzzle-to-garment distance determination by evaluating the gunshot residue pattern on the jacket. He explained, however, that he did not have access to the specific firearm used to fire the shots in question because the weapon was not recovered. Agent Brodhag stated that, based on the limited information he had available, he estimated that the gun used to shoot the victim was five to six feet from the victim at the time it was fired.

Patricia Ann Resig testified that she worked as a firearms examiner in the Forensic Unit of the KPD. Ms. Resig stated that she examined the spent 9mm shell casings collected from the crime scene and from the back porch of Ms. Hatch's house. She explained that the two spent shell casings from the back porch of Ms. Hatch's house matched one of the spent shell casings from the crime scene. She testified that they were fired from the same unknown firearm. She said that she could not determine whether the remaining four spent shell casings were fired from the same weapon because there was a lack of sufficient matching individual characteristics. Ms. Resig testified that she also examined the six 9mm caliber bullets recovered from the victim at autopsy. She stated that the bullets were consistent and could have been fired through the same unknown firearm but that there was a lack of sufficient matching individual characteristics. She said that the characteristics of the bullets and spent shell casings were not consistent with the pistol that was recovered from the victim's car, meaning that the pistol did not discharge the casings or bullets recovered and examined.

KPD Investigator Clayton Madison of the Violent Crimes Unit testified that he responded to the crime scene on Linden Avenue around 5:30 p.m. He was the lead investigator and asked additional investigators to conduct an area canvass of the neighborhood. He spoke to one witness at the scene, and based on the information learned, he put out a BOLO—"be on the lookout"—for two black males between the ages of 18 to 25 wearing dark clothing. Investigator Madison explained that the victim was transported to a local emergency room but that he later received a call saying that the victim had died. Investigator Madison attended the victim's autopsy and collected the victim's possessions,

including cash, clothing, and jewelry. He said that investigators were never able to recover the victim's cell phone after the robbery, despite the use of technology to try and locate it.

Investigator Madison recalled that he received information on a tip line that caused him to look at Defendant and Co-Defendant Booker as suspects. He obtained known fingerprints for them and provided those to Mr. Schade for comparison. He learned from Mr. Schade that the fingerprints from the front passenger area of the victim's car matched Defendant's and that the fingerprints recovered from the rear passenger area matched Co-Defendant Booker's. Investigator Madison explained that he then took out warrants through juvenile court for Defendant and Co-Defendant Booker. He also obtained a search warrant for Co-Defendant Booker's residence, which was executed on November 18, 2015. Co-Defendant Booker was taken into custody at that time, and Defendant was arrested later that same day. Investigator Madison testified that, at the time of Defendant's arrest, officers found a gun in a backpack belonging to Defendant. After Defendant was transported to the police department, Investigator Madison advised Defendant of his *Miranda* rights. Defendant waived his rights and agreed to speak to the investigator. The video of Investigator Madison's interview with Defendant was introduced as an exhibit and played for the jury.

During the interview, Defendant said that, on the night of the offense, he had been staying with Co-Defendant Booker on Speedway Circle and that he had arranged for the victim to pick them up. Defendant said that he and Co-Defendant Booker went outside to wait for the victim and that, while they were waiting, Co-Defendant Booker asked, "Do he got anything we can rob him for?" Defendant said that he told Co-Defendant Booker that he did not know. Later in the interview, Defendant claimed that he told Co-Defendant Booker, "We are not going to rob him today." Defendant said that Co-Defendant Booker told him that they should not stand in front of Co-Defendant Booker's "crib" because Co-Defendant Booker did not want the victim to know where he lived. Defendant said that, after they purchased some marijuana on Selma Avenue, Co-Defendant Booker told the victim that he wanted to go to his grandfather's house on Linden Avenue. Defendant said that he expressed concern, but Co-Defendant Booker tapped him on the right shoulder with a gun and said, "Bro, just chill." Defendant agreed that he did not get out of the car, even though he had "a lot" of opportunities to do so.

Defendant said that, when the victim turned onto Linden Avenue, Co-Defendant Booker asked for the victim's cell phone. Co-Defendant Booker made a few phone calls, and then he pointed the gun at the victim and said, "Run that, I need everything you got, even the watch." Defendant told Investigator Madison that he saw the victim reaching for a gun lying on the floorboard between the victim's feet. Initially, Defendant claimed that he immediately jumped out of the victim's car when he saw the victim reach for a gun. Defendant also repeatedly denied getting into a physical confrontation with the victim,

claiming, "I ain't touched that man." However, near the end of the interview, Defendant admitted that he physically prevented the victim from getting his gun. He said that he "tussled" with the victim in the front seat and that eventually they "pushed off" one another.

Defendant said that, after Co-Defendant Booker began shooting the victim, Defendant got out of the car and ran toward an alley, and Co-Defendant Booker joined him seconds later. Defendant said that, when he saw that Co-Defendant Booker still had the victim's phone, he was afraid the phone could be tracked, so he decided to call his sister to ask her to pick him up. Defendant said that he went with Co-Defendant Booker to get a new tattoo three days after the shooting.

Dr. Darinka Mileusnic-Polchan, the Medical Examiner for Knox and Anderson Counties, testified that she performed the autopsy on the victim. She said that the victim was shot six times, including a shot to the chest through the heart and three times in the back. Dr. Mileusnic-Polchan stated that she recovered six bullets from the victim's body and provided them to investigators for testing. She testified that the victim's cause of death was multiple gunshot wounds and that the manner of death was homicide.

Defendant testified in his own behalf. He said that, on the morning of November 15, 2015, he smoked a marijuana blunt with Co-Defendant Booker and then called the victim and asked the victim to "match a blunt" with him, meaning that he wanted to smoke marijuana with the victim. Defendant explained that, before he could meet up with the victim, he smoked his remaining marijuana and fell asleep. He woke up around 3:00 p.m. and learned that the victim was attempting to get in contact with him. Defendant contacted the victim and told the victim that he had smoked the last of his marijuana. Defendant asked the victim to come over and share the victim's marijuana with Defendant and Co-Defendant Booker, whom the victim did not know. After the victim agreed to meet them, Defendant and Co-Defendant Booker waited for the victim outside of Co-Defendant Booker's residence. Defendant testified that Co-Defendant Booker asked him, "What does [the victim] have that we can rob him for?" Defendant responded, "We're not robbing him." Defendant recalled that, after they got into the victim's car, the victim said that he had no marijuana and that a friend of his was bringing him some more. According to Defendant, the victim got tired of waiting and asked Defendant if he knew where they could purchase marijuana. Defendant stated that the victim gave him ten dollars that he used to purchase marijuana on Selma Avenue. They then went to a gas station to purchase a Black & Mild cigar. Defendant stated that the victim drove them back to Speedway Circle where they smoked the marijuana and listened to music in the victim's car. At some point, the victim explained that he needed to go to work, and he asked Defendant if they needed to be dropped off anywhere. According to Defendant, he responded that they were getting out on Speedway Circle but that Co-Defendant Booker asked the victim to drop them off at Co-Defendant Booker's grandfather's home on Linden Avenue. Co-Defendant

- 6 -

Booker then tapped Defendant on the shoulder with his gun and told Defendant, "[J]ust chill."

Defendant said that, once they arrived at the home on Linden Avenue, Co-Defendant Booker asked to use the victim's cell phone. After making a call and while still holding the victim's phone, Co-Defendant Booker told the victim to "run everything that he got." Co-Defendant Booker pointed the gun at the victim and told the victim to give up his watch. Defendant said that, as the victim was taking off his watch, the victim began reaching in the floorboard of his car. Defendant said that he "leaned up" to see what the victim was reaching for and saw that the victim had a gun. Defendant stated that he "tussled" with the victim for the gun. Defendant testified, "I was trying to stop him from getting the gun." He said that he "pushed off" the victim, and Co-Defendant Booker began shooting the victim. Defendant said that, after the third shot, he got out of the car and ran. He said that he and Co-Defendant Booker ran through an alley together, and he saw that Co-Defendant Booker still had the victim's cell phone. Defendant told Co-Defendant Booker to "get rid of the phone" because it could be traced, but Co-Defendant Booker said that he was keeping the phone. Defendant stated that he did not have a gun while in the victim's car but agreed that he had previously shot several firearms from the back porch of Ms. Hatch's house. He said that he met Ms. Hatch through Co-Defendant Booker and that they smoked marijuana and got drunk at her house.

Defendant testified that, after the shooting, he and Co-Defendant Booker split up and that he went to a friend's house. Defendant said that he did not call police or an ambulance following the shooting. He said that he had known the victim for about a month prior to the shooting and that they had smoked marijuana together previously. Defendant agreed that a gun was found in his backpack when he was arrested. He said that he had found the gun at a Halloween party a few days before the shooting and that he had carried it for protection. Defendant acknowledged that, during his police interview, he said that he told Co-Defendant Booker, "We're not going to rob him *today*." However, he denied saying that to Co-Defendant Booker; he explained that he added the word "today" during his interview because he was scared and nervous.

On cross-examination, Defendant explained that he was in the front passenger seat of the victim's car and that Co-Defendant Booker was in the back passenger seat at the time of the shooting. Defendant agreed that he learned in June 2015 that Co-Defendant Booker was a member of the Rollin' 20s Crips. He said that Co-Defendant Booker always carried a gun and that he continued to stay with Co-Defendant Booker after learning that he was a gang member. He agreed that neither he nor Co-Defendant Booker had a job, car, or money at the time of the shooting.

Defendant agreed that he had the opportunity to get out of the car on Speedway Circle. Defendant further agreed that he started to get out of the victim's car on Linden Avenue but stopped when Co-Defendant Booker pointed the gun at the victim. Defendant said that, when Co-Defendant Booker told the victim to "run that," both he and the victim knew what that meant. The victim put his hands up and turned to look at Defendant as if to ask, "What's going on?" Defendant said that the victim looked like he thought Defendant had set him up. Defendant said that he tried to prevent the victim from getting his gun by hitting the victim's arms. He said that he "tussled" with the victim and "tried to get the gun." He said that, after Co-Defendant Booker shot the victim in the shoulder, the victim said, "Y'all can have everything." Defendant testified that the victim tried to get out of the car but that Co-Defendant Booker shot him in the side and back. Defendant acknowledged that, had he not intervened, the victim would have been able to get his gun from the floorboard of the car.

Defendant agreed that he gave multiple versions of his story to Investigator Madison. He acknowledged that, in the first version, he denied being on Linden Avenue at the time of the shooting. After Investigator Madison confronted him with video surveillance footage from the market and the fingerprint evidence, however, Defendant admitted that he was in the victim's car but said that he got out of the car when Co-Defendant Booker took out his gun, which was also inaccurate. Defendant agreed that he tried to take the victim's gun during the offense. He said that he tried to get the gun from the victim because he thought the victim might shoot him. He acknowledged, that prior to the offense, "Ears" Tate told him that the victim had a gun that "Ears" Tate wanted to steal from the victim. Defendant agreed that he, "Ears" Tate, and Co-Defendant Booker were part of a group of friends called The Chain Gang. Defendant acknowledged that, at the moment he saw Co-Defendant Booker pointing a handgun at the victim and demanding property, he could have immediately gotten out of the car but that, instead, he chose to "tussle" with the victim to prevent the victim from accessing his own gun. Defendant agreed that he did not report the shooting after leaving the scene or volunteer any information about who had done it, until after his arrest. He further agreed that he continued to socialize with Co-Defendant Booker after the shooting.

Following deliberations, the jury found Defendant found guilty of the lesser-included offenses of two counts of facilitation of first degree felony murder and two counts of facilitation of especially aggravated robbery. At a subsequent sentencing hearing, the trial court merged Defendant's convictions for facilitation of first degree felony murder and sentenced Defendant, as a Range I standard offender, to twenty-five years with a thirty percent release eligibility. The trial court also merged Defendant's convictions for facilitation of especially aggravated robbery and imposed a sentence of twelve years with a thirty percent release eligibility to be served consecutively to the sentence for facilitation of first degree felony murder.

Defendant filed a timely motion for new trial, which the trial court denied in a written order following a hearing. This timely appeal follows.

## II. Analysis

Defendant contends that the evidence is insufficient to support his convictions. He argues that the State's evidence failed to establish beyond a reasonable doubt that he was aware that Co-Defendant Booker intended to rob the victim when the meeting with the victim was planned and asserts that, once he rejected the idea, he had no further reason to suspect that Co-Defendant Booker's intentions remained criminal. He argues that he remained unaware of Co-Defendant Booker's intentions "until it was too late for him to do anything either to prevent or assist those actions." Defendant insists that, after the robbery began, his actions were not "substantial assistance" to Co-Defendant Booker but, rather, were "inconsequential to the outcome of [Co-Defendant] Booker's plans." The State responds that, when viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's convictions for facilitation of first degree felony murder and facilitation of especially aggravated robbery. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). A defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

"A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (2015). "'Knowing'

refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn. Code Ann. § 39-11-302(b) (2015).

As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a) (2015). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2015). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2015). Especially aggravated robbery is robbery that is "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a) (2015).

Here, the proof at trial established that Co-Defendant Booker intentionally stole the victim's cell phone by violence and that he used a gun to inflict serious bodily injury, which resulted in the victim's death. Defendant testified that, while sitting in the victim's car, Co-Defendant Booker used the victim's cell phone and then pointed a gun at the victim and told him, "Run that, I need everything you got, even the watch." Defendant testified that Co-Defendant Booker took the victim's cell phone after shooting the victim multiple times. Dr. Mileusnic-Polchan testified that the victim suffered six gunshot wounds, including one to the chest that penetrated his heart, which caused his death. Investigator Madison confirmed that the victim's cell phone was missing from the crime scene and that it was never found by investigators, despite the use of technology to locate it. Thus, the evidence established that Co-Defendant Booker committed especially aggravated robbery and first degree felony murder.

Because Defendant was convicted of facilitation of the offenses, the issue is whether the evidence supports a conclusion that Defendant knew Co-Defendant Booker was going to rob the victim and that Defendant substantially assisted Co-Defendant Booker in the commission of the robbery. Defendant testified that he knew that Co-Defendant Booker was a member of the Rollin' 20s Crips and that Co-Defendant Booker always carried a gun with him. Before the victim arrived to pick them up, Co-Defendant Booker discussed robbing the victim and asked Defendant, "Do he got anything we can rob him for?" Although Defendant responded, "We're not going to rob him *today*," Co-Defendant Booker then suggested that they wait for the victim across the street because Co-Defendant Booker did not want the victim to know where he lived. Then, when they were in the victim's car, and Defendant expressed concern about why Co-Defendant Booker wanted the victim to take them to Linden Avenue, Co-Defendant Booker tapped Defendant on the shoulder with his gun and told Defendant, "Bro, just chill." Then, once they were on Linden Avenue, Co-Defendant Booker gained possession of the victim's cell phone,

thereby depriving the victim of the means to call for help. From these facts, a juror could reasonably infer that Defendant knew that Co-Defendant Booker still intended to rob the victim despite Defendant's claim that he told Co-Defendant Booker that they were not robbing the victim that day.

Furthermore, the evidence established that Defendant substantially assisted Co-Defendant Booker in the commission of the robbery. First, this court has previously held that a defendant provides "substantial assistance" for the purposes of facilitation of a felony when the defendant lures the victim to the scene of the crime. *See e.g., State v. Ronald Eugene Hall and Henry Lee Dixon*, No. M2003-02326-CCA-R3-CD, 2005 WL 292432, at *10 (Tenn. Crim. App. Feb. 8, 2005). In this case, it is undisputed that Defendant arranged for the meeting between the victim and Co-Defendant Booker, whom the victim did not know. When Co-Defendant Booker demanded the victim's property, the victim looked at Defendant as if Defendant had set up the victim to be robbed. Additionally, the jury could have reasonably concluded that Defendant provided substantial assistance to Co-Defendant Booker during the commission of the robbery by preventing the victim from getting his gun to protect himself from Co-Defendant Booker. Defendant admitted that, when he saw the victim reach for his gun, he tried to stop the victim. Defendant said that he hit the victim's arms and "tussled" with the victim over the gun and that, when he "pushed off" from the victim, Co-Defendant Booker shot the victim. On cross-examination, Defendant acknowledged that, had he not intervened, the victim would have been able to get his gun from the floorboard of the car.

When viewed in the light most favorable to the State, any rational juror could have concluded that Defendant knew Co-Defendant Booker intended to commit the robbery and that he knowingly provided substantial assistance to Co-Defendant Booker. Defendant is not entitled to relief.

### III. Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

ROBERT L. HOLLOWAY, JR., JUDGE